# ELIZABETH P. SCOTT

## V.

# M. Y. SUTHERLAND, JR., ET AL.

Record No. 811511

Decided March 8, 1985, at Richmond

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell and Thomas, JJ., and Harrison, Retired Justice.

*Robert P. Boyle; James Hingeley (Boyle & Bain,* on briefs), for appellant.

*Charles R. Haugh (James E. Treakle, Jr.; Haugh & Treakle, P.C.,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

In this suit arising from a contract for the sale of real estate, we review the action of the trial court in denying the purchaser specific performance and awarding the sellers damages.

The facts are not seriously in dispute. They are gleaned from testimony given during ore tenus hearings and from voluminous correspondence among the parties' attorneys and others involved in this controversy. The legal dispute does not turn upon widely conflicting facts but upon construction and interpretation of the uncontradicted evidence.

In a written contract dated July 17, 1978, appellant Elizabeth P. Scott, the purchaser, agreed to buy from appellees M. Y. Sutherland, Jr., and Phyllis H. Sutherland, the sellers, land in Albemarle County. The agreement described the property as: "All of those certain tracts or parcels of land containing in the aggregate 463 acres more or less, on the north side of St. Rt. 692 and desig-

nated on the Albemarle County Tax Maps as Parcels #86-24, #86-24-B and #87-3 . . . ." The description excluded a tract of four acres with a brick house and brick inn and included a barn as delineated on a sketch attached to the contract. The description also provided: "Final metes & bounds of 4 acres to be excluded shall be surveyed at Purchaser's expense." The contract price was $460,000, with $5,000 cash paid upon execution of the agreement; $125,000 cash to be paid at closing, scheduled for September 1, 1978; and $330,000 to be paid over a period of ten years.

The provision which generated this dispute was contained in paragraph 2 of an addendum, as follows:

"Purchaser reserves the right to survey this property prior to closing, and in the event such survey should disclose there are less than 463 acres in the above described property, the purchase price shall be abated at the rate of $1,000.00 per acre. If the survey should disclose more than 463 acres the purchase price shall be increased at the rate of $1,000.00 per acre."

In preparation for closing, the purchaser retained a surveyor and instructed him to do preliminary work to determine whether there was any risk in completing the transaction based on old plats already available. The surveyor reported that, using the old plats, the acreage called for in the contract would be accurate within "plus or minus two acres." The purchaser decided to close without further surveying. Upon learning of the surveyor's work, the sellers refused to close, insisting the purchaser was bound to provide a full, complete survey. Extended negotiations between the parties failed and the transaction eventually was aborted.

This litigation ensued with the purchaser filing in June of 1979 a bill for specific performance. Asserting she was ready, anxious, and willing to close the transaction, the purchaser alleged that sellers failed and refused to comply with the contract. She asked the court to order a conveyance of the property and other relief.

In their answer, the sellers alleged that a completed survey had showed "an acreage of 469.797 acres instead of the estimated 463 acres mentioned in said contract." Asserting the purchaser had never tendered or offered to tender the purchase price of $466,797, allegedly due because of the increased acreage, the sellers, in a cross-bill, sought damages for breach of contract.

Following hearings on the merits, the trial court ruled the purchaser had breached the contract, denied the request for specific performance, and awarded the sellers judgment on the cross-bill for $22,326.80. The purchaser appeals from the June 1981 final decree.

Paragraph 2 of the addendum was inserted at the suggestion of the purchaser's attorney, James B. Murray, Jr. Murray had been called on short notice to the purchaser's home, several days before the contract was executed, to advise his client during negotiations for purchase of the land, a part of the Sutherlands' farm that adjoined the Scott property. Murray, who knew Sutherland had been farming "that area for a long time," suspected that only descriptions in old deeds based on old surveys were available. Murray had not had the opportunity to examine the land records to determine "what sort of description existed." Thus, he suggested addition of the clause in question in order to give the purchaser "a right to have the property surveyed, should [Murray] . . . find out that these descriptions are inadequate."

Following execution of the contract, Murray discussed with his client the advisability of having the property surveyed prior to closing and whether "there was any risk to Mrs. Scott in going through with the contract as an in gross purchase." Murray had reviewed the land records and discovered three plats that "looked quite old" pertaining to the property. When Murray told his client that a complete survey would cost approximately $4,000, the purchaser indicated the estimate "was pretty expensive" and said "she didn't want a survey if she could avoid it."

Murray then contacted Kurt M. Gloeckner, an experienced Charlottesville surveyor. Murray asked the surveyor "to please go look at these old plats and give us an estimate of how accurate you think they are." Several days later, the surveyor reported to Murray that he had looked at the plats and that they did not "close." The surveyor also said there "was some risk to Mrs. Scott, that there might be a lot less acres than 463." Murray then asked the surveyor if there was "any cheap, inexpensive way to determine whether . . . the plats are accurate." The surveyor said that he could "do some field work," indicating he could "run around the property once, and get some feel where the corners lay, that sort of thing, and come back and let us know whether or not the old plats were accurate." Murray instructed Gloeckner to "as cheaply and quickly and inexpensively as possible . . . run out

there and take a look and give me an opinion whether the description that exists in the land records, the old plats, present any great risk to Mrs. Scott closing the transaction."

The surveyor obtained permission from Mr. Sutherland to go on the land. Gloeckner and two employees went to the property with "a compass and chain to see if we could find any of the old physical evidence, monuments, irons, trees, anything that was called for by the old plats." The surveyor testified he performed "a working traverse," which, he said, did not constitute making a survey or fixing a boundary of the property. In the process of performing a working traverse, according to Gloeckner, the surveyor selects a number of arbitrary points, for example, near an iron or monument, and uses those points to locate other physical evidence on the ground. "These points are also picked where the visibility is the best so that you can make the best time and make the longer shots." The surveyor testified that the working traverse "eventually leads to a mathematically closed geometrical figure. . . ."

After labor for the working traverse was concluded in the field, the results were plotted on a worksheet together with some of the points that had been "picked up along the way," such as fence posts, irons, and "trees with fence." Enlargements of the old surveys were placed over the worksheet. This showed that Gloeckner's lines were "sometimes in and sometimes outside of the property as described by the old plats." Using a computer, the surveyor then estimated the acreage within the working traverse and, by adding and subtracting, he estimated the acreage according to the old plats.

Upon completion of this work, Gloeckner compiled "a very rough report" for Murray. He made "an educated guess" that the contract acreage was off "plus or minus two acres" from the actual acreage. The surveyor submitted a bill to the purchaser for $2,650 to cover "Reconnaissance Survey of Tax Map 86, Parcels 24, 24B and Tax Map 87, Parcel 3, Albemarle County, Virginia."

Murray testified that, upon receipt of Gloeckner's report in early August indicating the purchaser did not "stand much risk" in using the old plats, he told the surveyor to proceed no further with work on the tract to be purchased. Gloeckner already had performed a full survey of the four-acre excluded parcel by that time, for which he billed the purchaser separately. Murray, and his law partners, prepared the necessary documents and announced that the purchaser was ready to close on September 1.

In the meantime, Mr. Sutherland had learned of the surveyor's apparently extensive activity on his property. During the last week of August, letters began passing between attorneys for the purchaser and the sellers. The sellers refused to close on September 1 and took the position that the purchaser was in the process of completing a full survey of the entire property and demanded a copy of the survey before closing. Counsel for the purchaser notified counsel for the sellers on September 11 that Gloeckner was not employed to perform a survey of the property but was instructed "to do the absolute minimum amount of work necessary to determine that the potential margin of error in the old surveys was significantly small that Mrs. Scott would incur no great risk by purchasing the property without a survey." Counsel for the purchaser pointed out that in the contract Mrs. Scott alone reserved the right to have a survey prepared and that she had not chosen to exercise that right. Mrs. Scott's attorney also wrote: "We have been prepared to close since September 1 and have the cash in hand with which to do so and hereby tender it to you."

No closing occurred, and the attorneys proceeded to inundate each other with lengthy correspondence. They debated such topics as the meaning of the addendum, the extent of Gloeckner's work on the property, whether the sellers were suffering damages by the delay, and the existence of a gore that may or may not have been within the bounds of the property covered by the contract.

As months passed with the controversy unresolved, the real estate agents involved on either side of the transaction attempted to engineer a settlement of the dispute. They agreed to finance a full, complete survey of the property if Mrs. Scott would agree to pay for any additional acreage disclosed by the survey. The purchaser agreed.

Gloeckner performed the survey, which was completed about December 6. The survey showed that the area was 6.7 acres more than the in-gross contract description, making the purchase price approximately $467,000.

The parties still could not agree to conclude the transaction. New issues were injected into the discussion. For example, the sellers claimed interest for the alleged failure of the purchaser to close on September 1. Finally, Mrs. Scott instructed her attorneys to soften their "rigid" position on some of the issues that had arisen. Testimony showed that she wished to close the transaction, "did not want to create any further animosity," and "wanted to do

whatever was necessary to placate Mr. Sutherland . . . without any further hardship [or] hard feelings. . . ." Accordingly, in a letter to the sellers' attorney dated January 29, 1979, the purchaser's attorney confirmed that Mrs. Scott would agree to a sale by the acre instead of an in-gross sale, and that she would "pay for the additional acreage. . . ." This offer was not accepted and, after new counsel entered the case for the purchaser, the present suit was filed in June of 1979.

Following consideration of the evidence, the chancellor ruled that the purchaser breached the contract and, therefore, was not entitled to specific performance. In addition, the court decided that the sellers were entitled to recover damages as the result of the purchaser's default. The chancellor, in an April 1980 letter opinion, determined that the "election to survey," under the addendum, "rest[ed] with the purchaser, Mrs. Scott." The trial judge wrote that "there was no requirement that Mrs. Scott survey the property, she only had [an] election to do so and not an obligation."

The court further ruled, however, that the evidence disclosed that the purchaser did "substantial survey work, [and] that this work was done for the purpose of determining the number of acres contained in the property." Continuing, the chancellor said, "We believe the evidence discloses that though a survey was not completed in the technical sense, that the purposes envisioned under the addendum . . . for a survey, that is the determination of acreage, were met by the work performed. Consequently, the purchaser was thus bound to perform in a manner consistent with the exercise of her election under the addendum. . . ." The court ruled that because a full, complete survey of the property was not provided by the purchaser, she was not ready to perform the contract at the time required.

Elaborating on the letter opinion during an April 29, 1980 hearing, the trial court said that once the purchaser "undertook to determine what the acreage was," then the purchaser "had to do all things that were necessary to complete what an effective survey would have done and to comply with the contract based on the results of that effective survey."

On appeal, determination of the legal effect of paragraph 2 of the addendum is dispositive of the controversy. Adopting the trial court's reasoning, the sellers contend that when the purchaser, having agreed to purchase land in gross and not by the acre, com-

menced survey work with respect to the tract to be purchased to determine the acreage, the purchaser was legally required to complete a full survey of the entire property. We disagree.

Under the language of the addendum, the purchaser had the right to change the nature of the contract from a sale in gross to a sale by the acre. *See Nelson* v. *Carrington,* 18 Va. (4 Munf.) 332 (1813). As the sellers point out, this change was to be accomplished by a survey. The trial court correctly held that the purchaser was not *required* to survey the property; she had an *election* to do so and not an obligation. Conversely, the sellers had no right to insist that the purchaser perform a survey. The right to require a survey was for the purchaser's benefit alone in connection with her right to convert the sale in gross to a sale by the acre.

The meaning of "survey," therefore, is crucial to a decision on the issue presented. The verb "to survey," in the context of this contract, means "to ascertain corners, boundaries, and divisions, with distances and directions, and not necessarily to compute areas included within defined boundaries." Black's Law Dictionary 1296 (5th ed. 1979). *Accord Kerr* v. *Fee,* 179 Iowa 1097, 1104, 161 N.W. 545, 547 (1917).

In *Miller* v. *Lawyers Title Ins. Corp.,* 112 F. Supp. 221, 224-25 (E.D. Va. 1953), Judge Hutcheson stated that the following definition of "survey" was not only "legally accurate" but was in common use and accepted: " '[T]he act by which the quantity of a parcel of land is ascertained; the paper containing a statement of the courses, distances, and quantity of land is also called a survey,' " *quoting* Bouvier's Law Dictionary 1159 (1940). The district court, in the process of holding that the document in issue relating to land in Surry County was merely a drawing and not a plat of survey, stated:

"There are no metes and bounds, courses and distances. There is no scale of measurement. There is no note of survey anywhere disclosed. The drawing bears no date nor does the name of a surveyor or engineer appear although on a copy there is the name of Charles Ruffin, with no reference as to his connection. Certain streams are reflected, including the James River, but the map, if such it may be called, is totally inadequate for the purpose of establishing either a starting point or a boundary line." 112 F.Supp. at 223.

According to the uncontradicted evidence, and against the background of the foregoing definitions, the purchaser did not, in the language of the addendum, "survey this property prior to closing." The witnesses used various terms to describe the extent of Gloeckner's work which was accomplished in response to Murray's instruction to "as cheaply and quickly and inexpensively as possible . . . run out there and take a look and give me an opinion whether the description that exists in the land records, the old plats, present any great risk to Mrs. Scott closing the transaction." Terms such as "working traverse," "field reconnaissance survey," and "preliminary work" were used to describe the surveyor's efforts. The trial court used the term "substantial survey work." Nevertheless, whatever term is used to describe the surveyor's activities, before September 1 he never performed a "survey" as defined above, nor was he requested to do so.

The effect of the trial court's ruling was to find that once the purchaser initiated activity to determine the acreage of the tract, the sellers acquired a right under the contract to, paraphrasing one of the foregoing definitions, demand that the purchaser proceed to ascertain corners, boundaries, and divisions, with distances and directions, and not merely to compute areas included within defined boundaries. In our judgment, such an interpretation is at odds with the clear language of the addendum and was not contemplated by the parties at the execution of the contract. Under the addendum, the purchaser could investigate to ascertain whether she would safely rely on old plats and deed descriptions without being forced, against her will and at the whim of the sellers, to convert a sale in gross to a sale by the acre by supplying a complete survey.

Therefore, we hold that the purchaser made a proper tender of performance in advance of the closing date of September 1 and that she was ready, willing, and able to perform in accordance with the contract for a sale in gross. It follows that the sellers breached the contract by their insistance on a full and complete survey and by their refusal to close on September 1. Because the transaction was not completed as agreed, the purchaser ultimately changed her position when she agreed to treat the contract as a sale by the acre after the agent-financed survey had been completed. But the sellers may not properly complain about this change of position because it is to their advantage, time not being of the essence of the contract. Under the addendum, the purchaser

became obligated to pay an increased price because of the additional acreage.

Accordingly, we will reverse the judgment of the trial court, annul the damage award, and remand the suit. The trial court will be directed to enter a decree requiring the sellers specifically to perform the contract; requiring the purchaser to pay, according to the addendum, for the increased acreage as disclosed by the completed survey; and dismissing the cross-bill.*

*Reversed and remanded.*

---

*We do not address the problem of the existence or location of the gore, an issue that was not raised in the pleadings and that is not germane to the suit for specific performance.